# In The United States Court of Federal Claims

No. 07-545C

**This Opinion Will Not Be Published in the U.S. Court of Federal Claims Reporter Because It Does Not Add Significantly to the Body of Law.**

(Filed under seal:  December 12, 2007)

(Reissued:  January 23, 2008)[1]

_____

| | |
|---|---|
| MEDICAL MATRIX, LLP, | * |
| | * |
| | * |
| Plaintiff, | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| SXC HEALTH SOLUTIONS, INC., | * |
| | * |
| Defendant-Intervenor. | * |
| | * |
| | * |

_____

**OPINION**

_____

**ALLEGRA, Judge**:

 This post-award bid protest action is before the court on the parties' cross-motions for judgment on the administrative record.  Plaintiff, Medical Matrix, LLP (Medical Matrix), argues that in awarding a contract for pharmacy management services, the United States Department of Veterans Affairs (the VA) committed nearly a dozen violations of the Federal procurement law.  Defendant asserts that these violations did not occur; it also asserts that even if these violations

_____

[1] An unredacted version of this opinion was issued under seal on December 12, 2007.  The parties were given an opportunity to propose redactions, but none were proposed.

occurred, they did not prejudice plaintiff.  After careful consideration of the briefs and other materials filed by the parties, the oral argument, and for the reasons discussed below, the court **DENIES** plaintiff's motion for judgment on the administrative record and instead **GRANTS** defendant's cross-motion.

I.     **Background.**

On May 20, 2005, the VA's Health Administration Center issued Solicitation No. RFP 741-07-05 (the Solicitation).  The Solicitation sought "the expertise of a Contractor (Pharmacy Benefit Manager (PBM) or Pharmacy Network Provider (PNP)) with an extensive network of retail pharmacies acting as a clearinghouse to provide [pharmacy] transactions and to conduct cost savings functions."[2]  More specifically, it contemplated the award of a firm, fixed-price contract for one base year (with four one-year options) to provide PBM services for three VA health benefits programs:  the Civilian Health and Medical Program (CHAMPVA), Spina Bifida Health Care, and Children of Women Vietnam Veterans Healthcare programs.[3]  Under the Solicitation, the awardees responsibilities include:  establishing and managing a pharmacy network; transmitting claims to providers; converting paper claims to electronic format and maintaining a centralized database of submitted claims; managing beneficiary lists; providing "help-desk" services to the beneficiary population; providing reports on claims history; and enacting measures to reduce overall benefit costs.  Potential offerors were advised that the awardee would handle approximately 3.5 million prescriptions annually:  1.34 million prescriptions electronically submitted through retail pharmacies, 1 million claims at VA mail-order pharmacies, and 1.13 million beneficiary-submitted or VA in-house paper claims.

Offerors were advised that the award would be made on a "best value" basis, considering technical capability, past performance, and price, with technical capability more important than past performance, and technical capability and past performance together more important than price.  However, the Solicitation cautioned that "the Government may make tradeoffs between factors addressed in the technical proposal, past performance, and price when determining which offer constitutes the best value to the Government," adding that "[t]his tradeoff process may

---

[2] From 1992-2005, Medical Matrix provided similar PBM services to the VA under a memorandum of understanding (the MOU).  In 2005, the VA decided that a formal contract would be a better vehicle for providing these services, particularly owing to new program requirements stemming from the enactment of Medicare Part D as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066, and other changes in the regulatory environment.  Examples of these changes include new reporting requirements, such as Drug Utilization Reviews, Beneficiary ID cards, the future implementation of a formulary, and changes to the website requirements.

[3] Of the three programs, the CHAMPVA program was by far the largest (approximately 250,000 enrollees versus 1,108 total enrollees in the other two programs).

result in an award to other than the low priced offer or other than the proposal with the highest non-price factor rating."

Bidders were to be evaluated according to six weighted factors, two of which had multiple subfactors, as illustrated by the following table:

| Factor/Subfactor | Weight |
|---|---|
| **Factor 1: Network Access** | 25% |
| **Factor 2: Non Network Pharmacy Services** | 10% |
| **Factor 3: PBM Services** | 20% |
|   Subfactor 1:   Program Requirements | |
|   Subfactor 2:   Pharmacy Network | |
|   Subfactor 3:   Claim and Reversal Submission to HAC | |
|   Subfactor 4:   Claims Reimbursement and Recoupments | |
|   Subfactor 5:   Help Desk and Phone Access for Beneficiaries | |
|   Subfactor 6:   Website Access | |
|   Subfactor 7:   Reporting | |
|   Subfactor 8:   Electronic Network Vendor Pile | |
|   Subfactor 9:   Pharmacy ID Card Plan | |
|   Subfactor 10: Industry Participation of Knowledge | |
| **Factor 4: Phase Transition Plans** | 10% |
| **Factor 5: Past Performance Information** | 10% |
| **Factor 6: Price** | 25% |
|   Subfactor 1:   Administrative Price | |
|   Subfactor 2:   Network Discount Price | |

Factors 1 and 2 (Network Access and Non Network Pharmacy Services, respectively) combined a pass/fail element with a merit rating for those bids that received a "pass" rating. Under factor 3, the offerors were required to provide a "clear plan" to meet the requirements in this section.[4] Each of the ten subfactors under factor 3 were assigned ten percent of the overall

---

[4] In describing the preparation of the technical proposals to be evaluated under this factor, the Solicitation stated – "[w]hen describing how each statement of work will be

value for this factor, making them each worth 2 percent (10 percent of 20 percent) of the total score.  The evaluation of factor 5 (Past Performance) incorporated each bidder's written description, but also included the results of an "investigation of submitted information and interviews conducted by the evaluation team," as well as other relevant information.  The Solicitation provided that the evaluation of factor 5 would "only consider past performance information as it relates to the PBM requirements listed," and instructed specifically that:

> The Contractor shall provide documentation of a minimum of three (3) facilities/contracts, demonstrating that it has been performing [the] same or similar Pharmacy Network and/or PBM services for a period of no less than 5 years at the HAC pharmacy claim volume or greater.

Price (factor 6) constituted 25 percent of the overall score and was comprised of two equally-weighted subfactors:  administrative price and network discount pricing, with each constituting half of the price score (12.5 percent of the total score).[5]  With respect to discount pricing, the bidders were given estimated quantities and average wholesale prices (AWP) for prescription drugs, and were asked to propose percentage discounts from AWP, as well as an average dispensing fee (not to exceed $3.00).

Under the Source Selection Plan, factors 1 through 4 and the subfactors thereunder were to be assigned scores ranging from 1 point (for a proposal that failed to meet minimum requirements and contained significant weaknesses deemed uncorrectable) to 4 points (for a proposal that exceeded the agency's minimum requirements and contained no weaknesses).  The scoring for the past performance factor differed slightly, as the evaluators could assign scores with decimals (*e.g.*, 3.5).  The past performance scores were defined as follows:

---

accomplished, the offeror will provide specific examples of how the task was accomplished for same or similar contracts in the past."  The same paragraph, however, later stated that "it is recommended that examples be used to further illustrate the methodology being presented and past uses."

[5]  Regarding price, the Solicitation further advised that "[p]roposals that are unrealistic in terms of technical capability or are unrealistically high or low in cost will be deemed reflective of an inherent lack of technical competence or indicative of a failure to comprehend the proposal requirements and will be rejected."  It explained that the government will evaluate, *inter alia*, the "[f]easibility of performing all RFP requirements within the total price proposed and [the VA's] knowledge of the pharmacy business environment."  Finally, it provided that "[a]ll priced items will be reviewed for price reasonableness and unbalanced pricing (*see* FAR 15.404-1)."

| Rating | Description |
|--------|-------------|
| 0 | neutral confidence |
| 1 | no confidence |
| 2 | marginal confidence |
| 3 | satisfactory confidence |
| 4 | high confidence |

These various numerical scores were then adjusted to reflect the weighting of the factors listed in the Solicitation.

On or before July 5, 2005, the VA received proposals from two offerors: plaintiff and SXC Health Solutions, Inc. (SXC). After evaluating these proposals, the agency engaged in discussions with both firms and obtained revised proposals. Following additional review, the VA awarded the contract to Medical Matrix. SXC filed a protest with the General Accountability Office (GAO), claiming that the VA did not provide equally meaningful discussions with both offerors. In response, the VA agreed to take corrective action by reopening discussions and reevaluating proposals, leading the GAO to dismiss the protest as "academic." Thereafter, the VA reopened the acquisition, engaged in further discussions and received revised proposals.[6]

In the new evaluation, both firms proposals received "high" ratings for factors 1 and 2, as well as identical score of 4 points/low risk under each of the technical evaluation factors and subfactors. The contracting officer acknowledged that each bidder exceeded the minimum requirements and noted that each had particular strengths. Contrasting these strengths, the contracting officer noted, *inter alia*, that Medical Matrix had experience from its prior thirteen years of work under the MOU, while SXC had actual experience with Medicare Part D – it was the first vendor approved to process Medicare D claims – that would confer advantage in handling the new Medicare Part D aspects of the programs. SXC also was identified as having a distinct advantage in terms of the experience represented by the transaction volume it had handled under its past similar contracts. For its highest-volume contract with Blue Cross/Blue Shield, SXC had processed 7 million transactions *a month*, while Medical Matrix had processed only 2 million claims annually for the VA. And although Medical Matrix had a preexisting help-desk and website, the VA contracting officer found that SXC's existing phone center could be readily adapted and that it had proposed a website that would offer enhanced functionality.

---

[6] During discussions, the VA asked each bidder generally to lower its price estimates, but it specifically asked Medical Matrix to lower its price estimate for generic drugs – "On your price proposal, please review, and consider lowering all of your pricing. You should especially look at line item 1006, and your percentage discounts for generic drugs." Medical Matrix did not do so.

With respect to the past performance factor, Medical Matrix received a score of 4 points and SXC received 3.7 points. SXC's four references gave it an average score of 3.55, but the VA's contracting officer adjusted this rating upward to 3.7, reasoning that several of SXC's lower reviews resulted from issues that would have diminished importance under the new contract.[7] In making several upward adjustments, the contracting officer determined that the slightly higher scores were "more reflective of the responses given in each category" by the raters.

The most significant difference between the two proposals was on price, which, as noted, constituted 25 percent of the total evaluation. The following chart reveals the major gulf that existed between the two proposals in this regard:

|  | **SXC** | **Medical Matrix** |
|---|---|---|
| Development and Implementation Costs | $200,000 | $60,389 |
| Administrative Costs (5 years) | $6,790,115 | $10,474,777 |
| Drug Costs (5 years) | $546,273,729 | $602,839,737 |
| TOTAL | $553,263,844 | $613,374,903 |

As can be seen, SXC's price was about $60.1 million (or about 11 percent) lower than that of Medical Matrix, primarily driven by the enormous difference between the parties' respective drug network discount prices and dispensing fees.

On February 23, 2007, the VA awarded the contract to SXC, with performance to commence on March 1, 2007. In explaining this award, the VA found the two bidders roughly equal in their "technical approach and past performance," noting that "[t]here are no major strengths offered by either that vastly exceed the other. Both have the technical capability to perform the contract requirements. Both have demonstrated full understanding of the contract's requirements." Ultimately, the decision came down to the "significant" savings to the

---

[7] The contracting officer found that several of SXC's references gave lower ratings based upon issues that likely would not arise under the new contract. He concluded that – "Overall, the scores given to SXC, and comments made by the raters, show that SXC is quite good at fulfilling all contract requirements in a highly satisfactory manner. It appears that they are not being rated with High confidence for providing services beyond what is called for in their contracts." The contracting officer further observed that the VA contract was "quite specific in its requirements" and it was unlikely that the VA would request SXC to perform any additional services. Accordingly, he adjusted SXC's overall score to more accurately reflect its past performance on contractual work.

government offered by SXC's $60 million lower total price. The evaluator noted that the technical and past performance factors were "essentially equal and thus cost became the most important factor[,]" and that "SXC is substantially better in both drug costs and administrative costs, offering a significant savings for the VA."

On March 5, 2007, Medical Matrix filed a new protest at the GAO, challenging the award to SXC. On June 12, 2007, the GAO denied Medical Matrix's protest, concluding that the VA's decision was supported by the administrative record. *See Medical Matrix, LP*, B-299526, 2007 CPD ¶ 123 (Jun. 12, 2007).

On July 19, 2007, Medical Matrix filed suit in this court, challenging the VA's evaluation and award of the contract to SXC. In its complaint, plaintiff sought: (i) a preliminary and permanent injunction preventing the VA from expending any funds under the contract awarded to SXC; (ii) an order directing the VA to award the contract to Medical Matrix; and (iii) a declaration that VA must terminate its contract with SXC and make the award to Medical Matrix. Alternatively, plaintiff sought an order directing the VA to conduct another evaluation and selection decision. On August 15, 2007, plaintiff filed its motion for judgment on the administrative record. Thereafter, defendant and defendant-intervenor filed cross-motions.

## II.   DISCUSSION

Before turning to plaintiff's specific claims, we begin with common ground.

### A.   Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." Toward this end, *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – are inapposite in deciding a motion for a judgment on the administrative record. *Id*. at 1356-57. It thus made clear that the existence of a fact question neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full blown evidentiary proceeding. *Id*.; *see also Int'l Outsourcing Servs., L.L.C. v. United States*, 69 Fed. Cl. 40, 45-46 (2005).[8] Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims]

---

[8] *Bannum* was based upon RCFC 56.1, which recently was abrogated and replaced by RCFC 52.1. The latter rule, however, was designed to incorporate the decision in *Bannum*. *See* RCFC 52.1, Rules Committee Note (June 20, 2006); *see also NVT Technologies, Inc. v. United States*, 73 Fed. Cl. 459, 462 n.3 (2006); *Bice v. United States*, 72 Fed. Cl. 432, 441 (2006).

were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1357; *see also Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005); *Doe v. United States*, 66 Fed. Cl. 165, 174 (2005), *aff'd*, 2007 WL 1073870 (Fed. Cir. 2007).[9]

     *Bannum*'s approach to deciding motions for judgment on the administrative record makes particular sense given the limited nature of the review conducted in bid protests. In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2006); *see also* 28 U.S.C. § 1491(b)(4) (2006). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003). As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the court, in order to apply this standard properly, must exercise restraint in examining information that was not available to the agency. A failure to do so risks converting arbitrary and capricious review into a subtle form of *de novo* review.[10] At all events, this court

---

[9] In *Bannum*, the Federal Circuit noted that, in *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1352-53 (Fed. Cir. 2004), it had erroneously conflated the standards under RCFC 56 and 56.1, albeit in *dicta*. In this regard, the *Bannum* court stated that –

> Although it never reached the factual question of prejudice, the *Banknote II* court added that it is the trial and appellate courts' task to "determine whether there are any genuine issues of material fact as to whether the agency decision lacked a rational basis or involved a prejudicial violation of applicable statutes or regulations." This language equates a RCFC 56.1 judgment to a summary judgment under RCFC 56 and is unnecessary to the *Banknote II* holding. Because the court decided the issue by an interpretation of the solicitation, e.g., making a legal determination, the court in *Banknote II* did not need to consider whether the trial court overlooked a genuine dispute or improperly considered the facts of that case.

*Bannum*, 404 F.3d at 1354. Prior decisions of this court have made the same error. *See, e.g., JWK, Int'l Corp. v. United States*, 49 Fed. Cl. 371, 387 (2001), *aff'd*, 279 F.3d 985 (Fed. Cir. 2002). Indeed, while various decisions of this court refer to a "motion for summary judgment on the administrative record," *see, e.g., ManTech Telecom. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 64-65 (2001), *aff'd*, 30 Fed. Appx. 995 (Fed. Cir. 2002), there was no such thing under former RCFC 56.1 (and is no such thing under RCFC 52.1), as properly construed.

[10] *See Murakami v. United States*, 46 Fed. Cl. 731, 734 (2000); *Aero Corp., S.A. v. United States*, 38 Fed. Cl. 408, 410-11 (1997); *see also Florida Power & Light Co. v. Lorion*,

will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *Grimberg v. United States*, 702 F.3d 1362, 1372 (Fed. Cir. 1983)). Indeed, a "protester's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).[11]

The aggrieved bidder must demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of America*, 365 F.3d at 1351, *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also Arinc Eng'g Servs. v. United States*, 77 Fed. Cl. 196, 201 (2007).[12] Moreover, "to prevail in a protest the protester

---

470 U.S. at 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court."); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (focal point of arbitrary and capricious review "should be the administrative record already in existence, not some new record made initially in the reviewing court"). As this court has explained elsewhere, *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) – often cited as basis for "supplementing" the administrative record – is, in part, heavily in tension with these Supreme Court precedents. *See Murakami*, 46 Fed. Cl. at 734-36.

[11] As noted by the Federal Circuit, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Galen Medical Associates, Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (citing *Burroughs Corp. v. United States*, 617 F.2d 590, 597-98 (Ct. Cl. 1980)); *EP Productions, Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005); *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 655 (2002).

[12] In *Banknote*, the Federal Circuit expounded upon these principles, as follows:

> Under the APA standard as applied in ... [bid protest] cases, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." [*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)]. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id*. at 1332-33 (citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id*. at 1333.

must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear. *See Banknote Corp. of America*, 56 Fed. Cl. 377, 380-81 (2003), *aff'd*, 365 F.3d 345 (Fed. Cir. 2004); *Seattle Sec. Servs., Inc.*, 45 Fed. Cl. at 566.

### B.   Plaintiff's Claims

Plaintiff lists a bevy of reasons (many with variations) why it believes that the award here should be set aside. Those claims are best analyzed categorically, as the following segments demonstrate.

#### 1.   Past Performance

Medical Matrix contends that the VA's evaluation of SXC's past performance was arbitrary, capricious and contrary to law. Relying on its construction of several provisions in the Solicitation, plaintiff argues that SXC lacked the required past performance and thus should not have received a past performance rating of 3.7. While this argument takes various forms, it essentially asserts that the VA deviated from the Solicitation in failing to apply the criteria state therein. Ample case law documents that such an error could lead the court to set aside the award here as arbitrary, capricious or otherwise contrary to law. *See Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377, 381 (2003); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 397 (2003) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). At the same time, "agency evaluation personnel are given great discretion in determining the scope of an evaluation factor." *Forestry Surveys and Data v. United States*, 44 Fed. Cl. 493, 499 (1999) (citing John Cibinic Jr. & Ralph Nash Jr., Formation of Government Contracts 830 (3rd ed. 1998) (hereinafter "Cibinic & Nash")); *see also Gulf Group, Inc.*, 56 Fed. Cl. at 397. Here, as will be seen, plaintiff's assertions of error rest largely on constructions of the language of the Solicitation that ultimately prove faulty.

For example, one of its banner claims is that SXC's past performance rating should have been lower because it failed to meet the Solicitation's requirement that stated – "[t]he Contractor shall provide documentation of a minimum of three (3) facilities/contracts, demonstrating that it has been performing same or similar Pharmacy Network and/or PBM services for a period of no less than 5 years at the HAC pharmacy Claim Volume or greater." Plaintiff initially asserted that

---

*Banknote Corp.*, 365 F.3d at 1351; *see also Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 42 (1997).

this provision should be applied severally, that is, each offeror had to show that it had performed three separate contracts, each of which for a period of no less than 5 years, involving the same or similar services and the specified volume. But, when forced, during briefing, to acknowledge that its proposal did not meet its own interpretation of the Solicitation, plaintiff abruptly altered its approach and then contended that some of the listed requirements could be met by accumulating contracts – for example, it argued that multiple contracts could be accumulated to meet the volume limitation. Plaintiff, however, still maintained that other listed benchmarks – those, conveniently, that SXC allegedly failed, like the duration of contracts – could not be accumulated, but rather had to be demonstrated on a contract-by-contract basis.

But, this verbal coat has too many colors. First, contrary to plaintiff's assertion, a natural reading of the clause in question suggests that all the documentation requirements were intended to be applied cumulatively across contracts and not on a contract-by-contract basis – in other words, the provision would be met so long as the contractor could show that it had a total of five years experience dealing with a total of three facilities dealing with services and volumes similar to those envisioned under the new contract. By its terms, the Solicitation thus did not require documentation of a minimum of three "contracts" demonstrating the requisite performance, but rather documentation as to the offeror's experience with three "facilities/contracts." Had the agency intended to focus solely on contracts, and not also on facilities, it easily could have said so.[13] But, it did not. Plaintiff, in fact, construes the language in the Solicitation in what has to be the least tenable fashion – it does not contend that all the criteria need be found in a contract, nor that they all may be met cumulatively. Rather, as noted, it asseverates that within a single, undifferentiating sentence, some of the criteria listed are to be interpreted cumulatively and others evaluated on a contract-by-contract basis. While that twist is novel and conveniently matches up with the strengths and weaknesses in plaintiff's experience, it is also capricious and

---

[13] Government agencies routinely promulgate solicitations requiring documentation of prior same or similar contracts. *See, e.g., PHT Supply Corp. v. United States*, 71 Fed. Cl. 1, 2-3 (2006) ("The offeror shall submit with its initial proposal contract references representing its recent, relevant performance under Government and/or commercial contracts. The contractor shall submit no more than five (5) contract references.") (emphases added); *Charles H. Tompkins Co. v. United States*, 43 Fed. Cl. 716, 722 (1999) ("Specifically, the definitive responsibility criteria required by section 1.24 of the solicitation included the submission of a listing which had to specify at least five contracts similar to the scope, size and dollar value of the present project, performed within the last three years."); *Clean Venture, Inc.*, B-284176, 2000 CPD ¶ 47 (2000) ("[T]he RFP asked each offeror to provide information about its performance under contracts 'for the same or similar services' during the past 2 years."); *PMT Services, Inc.*, B-270538, 96-2 CPD ¶ 98 (1996) ("DRMS will also consider an offeror's performance on same or similar contracts in terms of waste quantities, variety of pick up locations and waste streams, performance timeframes, and complexities of the services provided.").

finds no shred of support in the text of the provision, which makes no such fine distinctions.[14] The more reasonable construction of this language – and the one that the agency applied – is that all the listed requirements could be satisfied by aggregating experience across contracts.[15]

Seeking to have the agency downgrade SXC's past performance rating, plaintiff also cites "requirements" that have no foundation in the Solicitation. For example, it asserts that the VA's evaluation of past performance was arbitrary and capricious because the agency did not recheck references after reopening discussions. To be sure, in May 26, 2006, letters to the offerors, the VA indicated that the references "will be rechecked" and invited the offerors to provide additional references "if [they] wish." Plaintiff seems to argue that its letter constituted an offer that, upon its submission of a revised proposal, gave rise to an implied-in-fact contract. But, there is no indication that these letters were anything more than mere statements of intent. As such, they were not offers that could give rise to binding obligations upon the VA to recheck the references.[16] Certainly, there is no statute, regulation or precedent that would deem the situation otherwise – indeed, had the agency wished to amend the Solicitation to impose a new and binding evaluation requirement, it would have been obliged to comply with a variety of

---

[14] Clearly, the VA anticipated applying the five-year experience requirement flexibly. For example, at the time of the Solicitation, Medicare Part D, the processing of which claims was an essential component of the Solicitation, had only been in existence for less than two years. Accordingly, had the VA strictly enforced the five-year requirement on a contract-by-contract basis, no offeror would have been able to meet it.

[15] It should not be overlooked that were the court to adopt plaintiff's original construction of this provision – that all of the requirements applied on a contract-by-contract basis – neither plaintiff nor SXC would meet the requirement. There is no indication that plaintiff would have derived an advantage from such a negative finding – more likely, the spread between the offerors' respective past performance ratings would have been unaffected. Indeed, each of the offerors had one contract that met the Solicitation's duration and volume criteria. Medical Matrix's past performance score on that contract was 4.0, while SXC's score on its contract was 3.7 – reflecting precisely the spread that the VA ultimately adopted. Moreover, it should not be overlooked that while SXC's other contracts were of less than 5 years in duration, they involved volumes of transactions far in excess of the volumes contemplated under the Solicitation.

[16] *See Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 393 (2006) ("Before a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction."); Restatement (Second) of Contracts § 2(1) cmt. e (1979) ("Words of promise which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise."); 1 Arthur L. Corbin, Corbin on Contracts § 1.15 (rev. ed. 2005); *see also Hanlin v. United States*, 50 Fed. Cl. 697, 700 (2001); *National By-Products, Inc. v. United States*, 405 F.2d 1256, 1264 (Ct. Cl. 1969).

formalities.[17]  And it did not.  Apart from the existence of any contractual requirement, the court cannot say that the VA acted in an arbitrary and capricious fashion when it failed to check SXC's old references given that the VA had determined that SXC's performance with respect to a fourth reference that was provided in response to the May 26, 2006, letter was consistent with that under the first three references.  Accordingly, there is no indication that the agency's failure to recheck all of the references was significant.  *See Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.").

A final assertion repeatedly made by plaintiff is that SXC prior experience primarily was providing information technology solutions to firms providing PBM services – essentially, a claim that SXC was an application service provider (ASP) which provided only computer support to other pharmacy benefit managers.  This view, however, is contradicted by details in SXC's proposal and other aspects of the administrative record, all of which reveal that SXC had actively participated in providing PBM and pharmacy network services.  Thus, SXC's proposal listed, as one of its past performance references, a contract that it had been performing for Blue Cross/Blue Shield in Arizona since 1998.  Its proposal described this contract in the following terms –

> SXC Health Solutions is responsible for the complete pharmacy benefit management for Blue Cross Blue Shield of Arizona.  SXC is performing as a contractor for 100 [percent] of the services provided under contract.  The overall system scope includes pharmacy claims processing, plan benefit management, pharmacy network management, rebate management, drug utilization review, operational, clinical, and, financial reporting, and help desk support.  This plan provides pharmacy benefits to more than 700,000 members and is responsible for the management of more than 4,400,000 transactions.  SXC manages and operates the claims processing, rebate management, and administrative services support for [Blue Cross/Blue Shield of Arizona] in our Lombard, Illinois Pharmacy Benefits Management (ASP) Center.

Various documents in the record (including past performance references) corroborate that this contract was actually performed.  Contrary to plaintiff's claims, SXC thus had previously processed prescription benefit claims and performed pharmacy network administration services.[18]

---

[17] *See* FAR § 15.206(a) (providing detailed requirements for amending a Solicitation after the receipt of proposals).

[18] On this count, as well as others, plaintiff relies on extraneous factual materials that were not before the agency.  Plaintiff merely included these references in its briefs and statement of facts without filing a motion to supplement the administrative record.  As such, in the court's view, they are not properly before it.  Had plaintiff filed a motion to supplement the administrative record, every indication is that the court would have denied that motion.  *See*

-13-

The agency certainly did not act in arbitrary and capricious fashion either in reaching this conclusion or in making any of the other adjustments that it made in rendering the offerors' past performance scores.[19]

Finding these and the rest of plaintiff's claims regarding the VA's analysis of past performance to be misplaced, the court concludes that the analysis was not arbitrary, capricious or otherwise contrary to law.

### 2.    Technical Expertise

The VA concluded that both offerors possessed technical strengths that would benefit the government and assigned both the maximum score of 4 points.  In so concluding, the agency contrasted the parties' respective strengths.  It balanced, for example, plaintiff's experience performing under the MOU for 13 years with SXC's experience as being the first vendor approved to do Medicare Part D claims.  While the VA noted that SXC had more pharmacies in its network than Medical Matrix, it concluded both companies had high access rates.  And, although plaintiff was the incumbent contractor on the MOU, the agency noted that SXC had certain advantages over plaintiff – SXC, for example, had experiencing processing 7 million transactions in a month, while plaintiff had, at most, processed 2 million claims in one year.  Ultimately, these and other findings led the VA to conclude:

> Overall, both SXC and Medical Matrix provided plans that exceeded the minimum requirements . . . .  They both have proven records of accomplishment, and each offers various strengths to the government.

While admitting, as it must, that the evaluation of the technical proposals is a matter within the agency's sound discretion, *see E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002), plaintiff, nonetheless, suggests that, in making its findings, the VA again failed to apply the stated criteria in the Solicitation.

---

*Murakami*, 46 Fed. Cl. at 734-36 (describing the limited circumstances in which such motions should be granted).  And even if the court had granted such a motion, it is apparent that the materials, on their face, do not support the broad claims plaintiff makes regarding SXC's supposed lack of relevant experience.

[19]  While plaintiff contends that the agency "ignored" certain criticisms that were directed at SXC by its past contracting partners, the record reveals instead that the VA fully considered the criticisms, but simply did not view them in the same negative light as plaintiff.  Again, the court does not see any hint of arbitrary and capricious conduct, much for the reasons previously stated by the GAO in rejecting these similar claims.  *See Medical Matrix, LP*, B-299526, 2007 CPD ¶ 123 (Jun. 12, 2007).

In particular, it claims that SXC's technical proposal lacked examples of instances in which it had performed the various listed PBM services. It cites the portion of the Solicitation that, in describing the preparation of technical proposals, indicated that "[w]hen describing how each statement of work will be accomplished, the offeror will provide specific examples of how the task was accomplished for same or similar contracts in the past." But, this language was not found in the technical evaluation provisions of the Solicitation, which instead indicated that offerors would be evaluated under each factor and subfactor based upon plans to be submitted as part of the written proposal. Moreover, the same paragraph describing the preparation of technical proposals later stated that "it is recommended that examples be used to further illustrate the methodology being presented and past uses," which suggests that the use of examples was not mandatory. Accordingly, while the Solicitation clearly envisioned that experience in performing similar tasks was important, nothing therein indicated that a technical proposal would be downgraded if it did not include examples of past performance relating to each of the ten technical subfactors. Absent a specific instruction to that effect, enforcing such a mandatory requirement likely would have violated a fundamental principle of federal procurement policy – namely that all proposers must be advised of the basis on which their proposals will be evaluated. *See Textron, Inc. v. United States*, 74 Fed. Cl. 277, 307 (2006). In other words, while the VA could generally consider such examples, *see, e.g., Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 398 (2003); *Barnes & Reinecke, Inc. and FMC Corp.*, B-236622, 89-2 CPD ¶ 572 (1989), it was in no position to insist upon them for each subfactor.[20] In sum, it appears that the Solicitation envisioned that each offeror would demonstrate its capability to meet the contract requirements, using examples where appropriate. And that is exactly what SXC did, as the agency so found.

In various and sundry ways, plaintiff repeatedly asserts that the VA, in conducting its analysis of the technical proposals, ignored or misconstrued criteria or adverse information. But, these claims are all overstated and, at times, are predicated upon factual premises that simply are not borne out by the record.[21] Plaintiff has neither demonstrated that the contracting officer's findings are unsupported by the administrative record nor that they are inconsistent with the evaluation criteria. Rather, it offers little more than mere disagreements with the contracting

---

[20] Indeed, had the VA mandated the use of examples, plaintiff's proposal also would have been downgraded as it lacked experience on several of the listed subfactors (*e.g.*, the processing of Medicare Part D claims) and, not surprisingly, failed to provide specific examples as to these subfactors in its proposal.

[21] An example of the latter situation is plaintiff's claim that the VA erred in finding that SXC had significant experience in processing pharmacy claims. In fact, since 1998, SXC had been providing complete pharmacy benefit management for Blue Cross/Blue Shield of Arizona that entailed processing 7 million claims per month. SXC had provided similar pharmacy benefit services for HealthExtras, which entailed processing over 29 million annual transactions for 3 million plan members. And it had adjudicated millions of pharmacy claims for MemberHealth Inc. and MC-21 Corporation.

officer's assessment of the adequacy of its oral presentation.[22]  "Such naked claims," this court has stated, "by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious."  *JWK Int'l Corp.*, 52 Fed. Cl. at 660; *see also EP Prods., Inc.*, 63 Fed. Cl. at 226; *Banknote Corp.*, 56 Fed. Cl. at 384; *Carlson Wagonlit Travel*, B-2870162001 C.P.D. ¶ 49 (2001) ("an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably"); *PEMCO World Air Servs.*, B-2842403, 2000 C.P.D. ¶ 71 at 15 (2000) (same).  Again, the court finds no error here.

### 3. Price

Perhaps the most important of plaintiff's claims relate to the agency's evaluations of the prices offered by the offerors, which constituted 25 percent of the evaluation.  The prices offered by plaintiff were approximately 11 percent, or $60,111,059 higher, than those of SXC.  In particular, plaintiff's proposed administrative costs were $3,648,661.91 higher than SXC's, while its proposed drug discounts and dispensing fees were more than $56 million higher.  Plaintiff, however, contends the VA's evaluation of the SXC was arbitrary because "there is no evidence in the administrative record that any realism evaluation was performed on SXC's proposal or that a Total Evaluated Price was determined."  But, again, the facts do not support this allegation.

Although the Solicitation does not, in so many words, require the VA to conduct a "price realism" analysis, it does indicate that "[p]roposals that are . . . unrealistically high or low in cost will be deemed reflective of an inherent lack of technical competence or indicative of a failure to comprehend the proposed requirements and will be rejected."  Seemingly, the quoted language reflects a desire, on the part of the agency, to conduct a price realism analysis, designed "to ensure that an offeror understands the solicitation requirements and actually can perform those requirements prescribed in the [Solicitation] in the manner that it proposes."  *Erins Iraq. Ltd. v. United States*, 78 Fed. Cl. 518, 531 (2007); *see also Cortez, Inc.*, B-292178, 2003 CPD ¶ 184

---

[22]  A further example:  Medical Matrix contends that the VA "brushed aside" one contractor's criticism that SXC had difficulty transitioning new personnel.  *De facto*, the VA explained, in detail, why it did not fully credit this evaluation, stating:

> SXC provides the entire PBM services under the contract, which entails a great deal of information.  For the HAC they will not be providing all the services in this contract, and the numbers are less for the HAC. . . .  In my judgment, there is a learning curve for new employees, and based on the comment and other area's ratings, that is what appears to have happened in this case.

The VA further explained that it discounted this evaluation because it had carefully reviewed the training plan SXC had provided with its proposal and because all adverse performance problems with SXC had been resolved to this customer's satisfaction.

(2003). Although plaintiff intimates otherwise, the FAR does not direct agencies to use any particular tool in conducting a price realism analysis – indeed, it is largely silent on this subject. The absence of such guidance, of course, is a strong indicator that this matter is committed to agency discretion and, indeed, this court repeatedly has held that "[t]he depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and [this court] will not disturb such an analysis unless it lacks a reasonable basis." *Bisphereics, Inc. v. United States*, 48 Fed. Cl. 1, 9 (2000); *see also Labat-Anderson, Inc. v. United States*, 50 Fed. Cl. 99, 106 (2001) ("the nature and extent of an agency's price realism analysis are matters within the agency's discretion"); *Cardinal Scientific, Inc.*, B-270309, 96-1 CPD ¶ 70 (1996) (same).

Contrary to plaintiff's claims, the court finds that the VA acted rationally in making the price realism determination. Plaintiff essentially argues that the agency should have suspected that SXC's price was unrealistic and did not reflect an understanding of the Solicitation's requirements because it was so much lower than its own. However, the agency not only carefully analyzed SXC's proposal to determine whether, in fact, it understood the Solicitation's requirements, but also clearly compared the two competing offers in question, isolating and analyzing the reasons for the price differences. It concluded that SXC's lower price was not a misjudgment, but rather reflected its experience in dealing with Medicare Part D Plan benefits. In this regard, the source selection authority explained:

> While Medical Matrix could be seen as having the upper hand in estimating this work as they are the current contractor, the additional work added into this contract as opposed to what is in the MOU would negate that. SXC has been doing similar work to what this solicitation requests so they have good knowledge of the market.

Accordingly, the VA did not don blinders to the potential sources of the disparity between the two offerors' prices, but rather, after evaluation, simply came to the conclusion that SXC's proposal reflected a reliable, albeit lower, price that still represented conformity with all of the Solicitation's requirements. As such, there was a reasonable basis for the agency's price realism determination.[23]

---

[23] *See Info Sciences Corp. v. United States*, 73 Fed. Cl. 70, 103 (2006) (price realism properly conducted where agency "considered the reasons for [the awardees] low price proposal"); *Matter of Burns & Roe Servs. Corp.*, B-296355, 2005 CPD ¶ 150 (2005) (agency accomplished reasonable price realism analysis by "comparing prices against one another and the independent government estimate, reviewing each offeror's cost proposal for compliance with the terms of the solicitation, for mathematical accuracy, and comparing pricing data with the technical proposal"). It is unclear whether plaintiff is also attacking the VA's price reasonableness analysis. Unlike price realism, "the purpose of price reasonableness analysis is to ensure that the offeror's price is not unreasonably high or unreasonably low." *Erins Iraq. Ltd.*, 78 Fed. Cl. at 531; *see also* Ralph C. Nash, Jr. & John Cibinic, Jr., Price Realism: It's Different From Price Reasonableness, 17 No. 3 Nash & Cibinic Rep. ¶ 14 (2003). Here, the price analysis

Indeed, the VA apparently felt so strongly that SXC's discounts were appropriate that, during discussions, it requested plaintiff to consider lowering its generic drug prices. However, plaintiff did not do so. Moreover, contrary to plaintiff's intimations, that SXC's drug prices were considerably lower than the VA's price estimate is not a sign that its prices were unreasonable, *cf.* Cibinic & Nash, *supra* at 1316-17, but rather was to be expected given that the VA's estimate, by the Solicitation's terms, did not account for drug discounts that the VA expected the offerors to propose.[24]

### 4. Prejudice

Finally, if the absence of legal error were not reason enough to reject the requested relief, the court observes that plaintiff has not proven that it was prejudiced by any alleged violation of law. As noted above, to demonstrate prejudice, a "protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation*, 175 F.3d at 1367 (quoting *Statistica,* 102 F.3d at 1582); *see also Bannum*, 404 F.3d at 1358; *Galen Med. Assocs.*, 369 F.3d at 1330; *Int'l Outsourcing Servs.*, 69 Fed. Cl. at 47.

In the case *sub judice*, plaintiff's assertions of error, even if accepted, would diminish only slightly the overall score that SXC received for its past performance and technical proposal. Many of plaintiff's claims relate to several subfactors that individually accounted for only 2 percent of the total score; if adopted, those claims would only lead to SXC's score under those subfactors being reduced by perhaps a few tenths of a point. Simple mathematics suggests that the combined effect of these asserted errors would be negligible – all the more so since, in many instances, plaintiff's assertions of error, if true, would lead to its own score being reduced, as well. On the other side of the ledger, there is no indication that the agency erred whatsoever in analyzing the prices offered by the parties – a factor representing a hefty 25 percent of the evaluation. In many ways, the reasonableness of the latter evaluation dooms plaintiff's case. *See*

---

employed by the VA, which relied on a comparison of the offers that it received, is consistent with one of the methodologies specified by the FAR for reviewing price reasonableness. *See, e.g.*, FAR §§ 15.403-1(c)(1) (defining adequate price competition); 15.404-1(b)(2) (price reasonableness may be made by "[c]omparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes price reasonableness . . .").

[24] Plaintiff's arguments on this point are based on further mischaracterizations of the administrative record. For example, on brief, it asserted that SXC had admitted that its generic drug discounts could prove problematic, stating "SXC's own proposal warned that deep drug discounts would likely drive pharmacies out of the network." The cited passage in SXC's proposal, however, stated: "We have purposely NOT attempted to propose unrealistic or highly risky dispense fees and discounts in order to ensure that we can retain the existing pharmacy network members and attract others." (Emphasis in original). It also worth noting, as the VA did during its analysis, that SXC had over 7,800 more pharmacies in its network than did plaintiff.

*Axiom Resources Mgmt., Inc. v. United States*, 78 Fed. Cl. 576, 590 (2007) (no prejudice where minor errors in technical and past performance ratings and significant differences in price); *see also Data General*, 78 F.3d at 1563 (indicating that price differential is a factor that may be considered in assessing prejudice). At the least, Medical Matrix has not shown that, absent the errors it identifies, it would have a substantial chance of receiving the contract in question. Accordingly, the court finds that plaintiff was not prejudiced by anything that the agency did or failed to do here.

### III.  CONCLUSION

This court need go no further. Measured by the appropriate standard of review, the VA's conduct here was neither erroneous nor prejudicial to plaintiff. The injunctive relief requested by plaintiff, therefore, is inappropriate.

In consideration of the above, **IT IS ORDERED**:

1. Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross motion for judgment on the administrative record is **GRANTED**.

2. This opinion shall be publicly released, as issued, after January 15, 2008, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge